WATCHTOWER BIBLE & TRACT SOCIETY, INC., et al., Plaintiffs, v. METROPOLITAN LIFE INSURANCE COMPANY, Defendant.

Supreme Court, Special Term, New York County, March 12, 1947.

*Hayden C. Covington* for plaintiffs.

*Stuart N. Updike, James W. Rodgers* and *John R. Schoemer* for defendant.

PECORA, J. In this action plaintiffs seek a declaratory judgment, and also an injunction against interference by defendant with their exercise of the constitutional rights of freedom of speech, of press and of worship in a housing project known as Parkchester situated in the borough of The Bronx of the city of New York.

Parkchester is owned, operated and maintained by the defendant. It consists of 171 interrelated apartment houses, accommodating approximately 12,000 families, and housing about 35,000 persons. It covers an area of about 129 acres. It includes many private streets, ways and park areas, as well as stores and places of amusement such as motion-picture theaters. Two or three public highways run through it. It may well be compared to a fairly substantial community, although one that is privately owned.

The three individual plaintiffs are connected with the corporate plaintiff, which is a domestic corporation organized under another name in 1909, under the Membership Corporations Law of this State. They bring this action not only for themselves individually, but also in behalf of all other members of the Society similarly situated. These members are known as Jehovah's Witnesses. They claim to be missionary evangelists, and that they are engaged in the " charitable work of preaching the gospel of the Kingdom of Almighty God, under direction of the Society, publicly upon the streets and from house to house, throughout the City of New York."

The Jehovah's Witnesses number over 60,000. Their activities are world-wide, although they are pursued principally in this country. The Society regards them as ordained ministers of the gospel. It has no ritualistic rites of ordination, nor does it require that its members shall pass any examination to test their intellectual qualifications to become such ordained ministers. In this connection it may be observed that the Society is not organized under our Religious Corporations Law.

Jehovah's Witnesses preach their beliefs mainly by going from door to door of dwelling places, seeking thereby through distribution of their literature and by word of mouth to interest the occupants in their tenets. At times their oral messages are

conveyed through portable phonographs which they carry for that purpose.

For several years prior to the institution of this action teams of Jehovah's Witnesses visited Parkchester and went from door to door of its apartments, ringing the tenants' bells in efforts to preach their gospel messages, and to distribute their literature. The persons to whom the literature was offered were solicited to make a " contribution " therefor; but sometimes, under special circumstances, it would be given gratis. These visits at first were sporadic. But beginning with the summer of 1944 they became more regular, taking place weekly.

Because of complaints received by defendant from some of its tenants over these visits, defendant instructed its private guards to intercept the Jehovah's Witnesses when they entered Parkchester, and prevent them, by ejectment if necessary, from engaging in their preaching activities from door or door.

Upon the trial plaintiffs undertook to show that their preaching activities in Parkchester were conducted in a peaceful and orderly manner; and that whenever a tenant informed them that he was not interested in their preachings or literature they desisted from further efforts to enlist the sympathetic attention of such tenant. This was disputed by some tenants who testified for defendant.

The evidence established, however, that plaintiffs frequently renewed their visits to tenants who had previously expressed they had no interest in the preachings and literature of plaintiffs, in the hope eventually of arousing their favorable interest therein.

For some weeks prior to the bringing of this action, plaintiffs made protests to defendant regarding the instructions it had given its employees to prevent the plaintiffs from conducting their door-to-door activities among its tenants; and they requested defendant to rescind those instructions, and to permit plaintiffs to engage in such activities without interference. Defendant refused so to do. It called the attention of plaintiffs to the following regulation which it had adopted, and which it had instructed the employees to enforce: " No person or group of persons shall enter any apartment building in the Parkchester development for the purpose of canvassing or of vending, peddling or soliciting orders for any merchandise, device, book, periodical, pamphlet, circular, or for any printed, mimeographed, multigraphed or typewritten matter whatsoever; nor for the purpose of soliciting alms, donations, or a subscription or a

contribution to any church, religious, charitable, or public institution or organization whatsoever; nor for the purpose of distributing any handbill, pamphlet, circular, tract, book, booklet, notice, or advertising matter; nor for the purpose of playing any phonograph or musical instruments in said apartment houses in connection with such canvassing, vending, peddling, solicitation or distribution; *providing, however, that such canvassing, vending, peddling, soliciting or distribution* may be made with the consent of the manager of the development or *may be made within the apartment of any tenant if the prior written consent or invitation of such tenant shall have previously been furnished or exhibited to the manager of the development.*" (Italics by the court.)

Defendant claims to have the right, as owner of the development, to promulgate and enforce this regulation respecting the use of its own property. It also claims that right under rule 15 of the " Rules and Regulations " which form part of the written lease agreement it has made with each of its tenants, which rule 15 is as follows: " 15. The Landlord reserves the right to rescind or change any of the foregoing rules, and to make such other rules and regulations from time to time as may be deemed needful for the safety, care and cleanliness of the premises and for securing the comfort and convenience of all the Tenants."

Defendant further asserts its power to adopt the regulation under a provision of its leases which gives to it as landlord the specific right to make " rules and regulations as the landlord may from time to time deem needful, and prescribe for the safety, care, and cleanliness of the building, and the preservation of good order therein, as well as the comfort, quiet and convenience of other occupants of the building."

Plaintiffs, on the other hand, attack the regulation as not authorized by the terms of the leases between defendant and its tenants. They further charge that it is unreasonable, arbitrary, capricious, and unauthorized by law; that it unlawfully abridges and denies the rights of the tenants to freedom of speech, of press and of worship; and that it is an unreasonable and arbitrary abridgment of the rights of plaintiffs to preach the gospel from door to door, contrary to the First and Fourteenth Amendments of the Federal Constitution, and of the State Constitution " because it provides for censorship of religious beliefs and practices within Parkchester by the defendant."

Hence plaintiffs now pray for a declaratory judgment to the effect that they have a constitutional right to enter into the defendant's apartment houses in Parkchester and make door-to-door calls upon the tenants thereof for the purposes of preaching their messages and distributing their literature; that the defendant's aforesaid regulation be declared void and invalid and unenforcible as against plaintiffs; and that defendant has no right to interfere with plaintiffs in their preaching and related activities within said apartment houses. They further pray for an appropriate injunction to restrain defendant from enforcing its regulation and otherwise interfering with the exercise of the asserted rights of the plaintiffs in Parkchester.

The defendant maintains that plaintiffs have no such constitutional rights. It contends that its acts have been proper and lawful, and that they do not constitute any improper interference with any rights possessed by plaintiffs.

The evidence establishes that in March, 1946, defendant conducted a written poll of its tenants to ascertain which of them desired to have visits from Jehovah's Witnesses. A very large majority of the tenants responded, with the result that only about thirty of them indicated their desires to receive such visits. These facts were promptly communicated to counsel for plaintiffs, together with the names of the tenants who desired the visits. At the same time defendant offered to make all the replies available to plaintiffs' counsel, and informed him that defendant would permit Jehovah's Witnesses to visit the tenants who wished to receive them.

This was followed by the institution of this action by plaintiffs. During its pendency, and before its trial, about 250 Jehovah's Witnesses, suddenly and without notice of any kind to the defendant, entered the apartment houses in Parkchester on Sunday, April 28, 1946. They went from door to door of the tenants' apartments and sought to obtain their signatures to a " petition " calling upon the defendant to permit Jehovah's Witnesses to enter the apartment houses and make door-to-door calls upon the tenants. The proof in behalf of plaintiffs shows that 1,736 signatures of tenants were thus obtained, out of a total of 7,746 tenants who had been interviewed on that Sunday.

The voluminous evidence contains many pieces of the literature distributed by plaintiffs, including books, pamphlets, tracts, leaflets and magazines, all of which have received the court's consideration. Their literature inveighs scornfully

against all religion " as a desolate thing, as a snare and a racket." It condemns all religious groups and organizations as being parts of Satan's visible governments on earth. It regards the devil as the " author " of all organized religions. It refers to the Roman Catholic hierarchy as a " street walker ", and its business as " enticing and seducing others." It charges that the leaders of religious organizations include " thieves, robbers, liars, whoremongers, murderers, kidnapers, frauds, and cheats."

Plaintiffs' literature also declares that all organized governments and their agencies are part of Satan's invisible government on earth. Yet they come before this court — which, according to their beliefs, is an instrument of Satan's government — and invoke its powers for their protection. The court, of course, recognizes that plaintiffs are entirely justified in seeking its protection in the exercise of rights which they claim to have under the Constitution of our Government, even though they regard that government as dominated by Satan.

Instead of being chartered under our Religious Corporations Law, the plaintiff Society is incorporated under our Membership Corporations Law. It claims to be a nonprofit organization, and that its adherents are engaged in the " charitable work " of preaching the gospel of the Kingdom of Almighty God. But it admits that it does not bestow or distribute any other form of public charity or philanthropy. The evidence shows that it owns and operates a large printing plant in Brooklyn, wherein its literature is printed. The Society is fully reimbursed by its ministers or workers for the literature which they distribute to the public, and its gross income therefrom exceeds $1,000,000 annually, at least in recent years. Its ministers or workers for the most part distribute such literature to the public for sums or " contributions " which net a substantial profit to them over and above the prices which they pay to the Society for it.

Notwithstanding such anomalies as may be evidenced in the avowals and activities of the plaintiffs, this court is inclined to credit them with sincerity in their protestations and professions of faith. It will pass no opinion, however, upon their soundness, for it is unnecessary to do so in order to decide the issues here raised. In the exercise of the rights of freedom of speech, of press and of worship, one may disseminate his views, no matter how unorthodox or abhorrent even they may seem to others.

To support their contentions, plaintiffs strongly rely upon certain decisions rendered in recent years by the United States Supreme Court in cases involving the door-to-door activities of Jehovah's Witnesses in preaching and distributing their literature. (*Murdock* v. *Pennsylvania,* 319 U. S. 105; *Jones* v. *Opelika,* 316 U. S. 584; *West Virginia State Bd. of Education* v. *Barnette,* 319 U. S. 624; *Lovell* v. *Griffin,* 303 U. S. 444; *Jamison* v. *Texas,* 318 U. S. 413; *Martin* v. *Struthers,* 319 U. S. 141; *Marsh* v. *Alabama,* 326 U. S. 501; *Tucker* v. *Texas,* 326 U. S. 517; *Schneider* v. *State of New Jersey,* 308 U. S. 147; *Largent* v. *Texas,* 318 U. S. 418; *Cantwell* v. *Connecticut,* 310 U. S. 296; *Follett* v. *McCormick,* 321 U. S. 573.)

These cases revolved around various statutes and municipal laws, ordinances and regulations, for the violation of which members of Jehovah's Witnesses were convicted. These convictions were reversed on the ground that the enactments and measures in question were unconstitutional, in that they abridged or denied the rights of free speech, of press and of worship.

In the case at bar, however, there is no issue involving the validity of any statute, or of any municipal act, ordinance or regulation. This is not a case wherein plaintiffs are being deprived of any constitutional rights, through the operation or exercise of any governmental power. The regulation here attacked is a private one adopted by defendant in its capacity as the landlord of the Parkchester apartment houses. It is designed to increase the safety, care and cleanliness of the houses, to preserve good order therein, and to promote the comfort, quiet and convenience of their occupants. The right to prescribe it was given to defendant by the provisions of its written leases with its tenants, hereinabove quoted.

To the foregoing extent this case differs from those above cited which are so insistently relied upon by plaintiffs. It has long been established that the First Amendment to the Federal Constitution prohibits Congress from passing any law abridging the rights of free speech, of the press, and of worship; or the rights of the people to peaceably assemble and to petition the government for a redress of grievances; and that the Fourteenth Amendment prohibits a State from depriving any person of life, liberty or property without due process of law, and from making or enforcing any law abridging the privileges or immunities of citizens of the United States. But neither amendment adds anything to the rights of one citizen as against another, nor do they inhibit action by individuals in respect of their property. (*United States* v. *Cruikshank,* 92 U. S. 542;

*Virginia* v. *Rives,* 100 U. S. 313; *United States* v. *Harris,* 106 U. S. 629; *Civil Rights Cases,* 109 U. S. 3; *Corrigan* v. *Buckley,* 299 F. 899, appeal dismissed 271 U. S. 323.)

But even if it be assumed, for the sake of argument, that the validity of the private regulation here involved is to be tested by the principles laid down in the Jehovah's Witnesses cases above referred to, this court is of the opinion that the regulation does not contravene any of those principles. Not one of those cases has held that Jehovah's Witnesses, or others having similar pursuits, have a constitutional right to enter *within* an apartment house or multiple-dwelling house, against the wishes of its owner or occupants. Those cases, it is true, have upheld their right to go *upon* the streets and to go from house to house and knock upon the doors *abutting* on the streets, in order to enable them to distribute their literature and to deliver their evangelical messages. It was even held that they had the right so to do in cases where the streets as well as the abutting houses were all privately owned by a corporation (*Marsh* v. *Alabama,* 326 U. S. 501, *supra*); and where they were owned by an agency of the United States Government (*Tucker* v. *Texas,* 326 U. S. 517, *supra*). But that august court has yet to rule that they have any constitutional right to go *beyond* the streets (whether publicly or privately owned) and *into* the abutting houses against the wishes of the owners or occupants. I do not think its adjudications thus far have destroyed the time-honored maxim that a man's home is his castle, nor any of its cherished implications.

The inner hallways of apartment houses are not to be regarded in the same light as public roads, streets or highways, even when the naked fee of the latter is privately owned. As was said in *Hague* v. *C. I. O.* (307 U. S. 496, 515): "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights and liberties of citizens."

Does the foregoing mean that the inner hallways of apartment houses, merely because they must be traversed from the street in order to reach the actual apartments wherein the tenants reside, likewise are burdened with the rights which the public has in streets? Do such inner hallways constitute places of public assembly, or for communicating thoughts one to another,

or for the discussion of public questions? In the opinion of this court, the answer to those questions is clearly " No ".

This answer is fortified by the case of *Brendlin* v. *Beers* (144 App. Div. 403 [1st Dept.]). There plaintiff sued for assault and battery, claiming he was forcibly denied access, by the janitor, to an apartment house to which he had gone for the purpose of collecting a bill from a tenant. The court in holding that plaintiff had no right to enter the apartment house without the owner's consent said (p. 404): " The alleged cause of action is predicated upon the proposition that the plaintiff had a legal right to enter the apartment house, notwithstanding the fact that the owner forbade his doing so. He had no such right * * *. When the owner of a house rents it to another he thereby confers upon the tenant the right to use the building, or such part of it as is rented, and this includes an easement of ingress and egress by the usual way. This easement, however, is for the tenant (*Totten* v. *Phipps*, 52 N. Y. 354; *Doyle* v. *Lord*, 64 id. 432), and third parties, except upon the invitation, either express or implied, of the landlord or tenant, have no more right to enter the building than they would if it were vacant."

There is no invitation, either express or implied, to the public to enter into the common hallways of an apartment house for the purpose of using them as a forum in which to air one's views on any subject, be it religious, political or anything else.

Again, if it be assumed that the invalidity of defendant's regulation is to be measured by the rulings of our highest court in the Jehovah's Witnesses cases above discussed, this court holds that it is just the kind of regulation that the United States Supreme Court indicated, in *Martin* v. *Struthers* (319 U. S. 141, *supra*) would not abridge or deny any of the constitutional rights which plaintiffs here claim to have.

In that case the plaintiff Martin — a Jehovah's Witness — was convicted of violating a city ordinance which made it " unlawful for any person distributing handbills, circulars or other advertisements to ring the door bell, sound the door knocker, or otherwise summon the inmate or inmates of any residence to the door for the purpose of receiving such handbills, circulars or other advertisements they or any person with them may be distributing." In reversing the conviction the court held that the ordinance was invalid as conflicting with the freedoms of speech and press. It said, *inter alia* (pp. 143–144, 146): " The ordinance does not control anything but the distribution of literature, and in that respect it substitutes the

judgment of the community for the judgment of the individual householder. It submits the distributor to criminal punishment for annoying the person on whom he. calls, even though the recipient of the literature distributed is in fact glad to receive it. \* \* \* Freedom to distribute information to every citizen wherever he desires to receive it is so clearly vital to the preservation of a free society that, putting aside reasonable police and health regulations of time and manner of distribution, it must be fully preserved. The dangers of distribution can so easily be controlled by traditional legal methods, leaving to each householder the full right to decide whether he will receive strangers as visitors, that stringent prohibition can serve no purpose but that forbidden by the Constitution, the naked restriction of the dissemination of ideas. \* \* \* The National Institute of Municipal Law Officers has proposed a form of regulation to its member cities which would make it an offense for any person to ring the bell of a householder who has appropriately indicated that he is unwilling to be disturbed. This or any similar regulation leaves the decision as to whether distributors of literature may lawfully call at a home where it belongs — with the homeowner himself.'' And, at the very outset of its opinion the court said (p. 141): '' Whether such visiting shall be permitted has in general been deemed to depend upon the will of the individual master of each household, and not upon the determination of the community.''

Defendant's regulation serves to do precisely that which was held in *Martin* v. *Struthers* (*supra*) would be proper. It leaves to each tenant in Parkchester the right to determine for himself whether he wishes to receive visits or literature at his home from Jehovah's Witnesses. The requirements that such wish be in writing and either furnished or exhibited to defendant's resident manager, are not unreasonable, arbitrary or capricious, and do not impose any undue burdens upon either the plaintiffs or any tenant desiring visits from them. It follows, therefore, that the regulation does not deprive plaintiffs of their rights of freedom of speech, of press and of worship in contravention either of the First and Fourteenth Amendments of the United States Constitution, or of the Constitution of this State. It also follows that plaintiffs have no right to the injunctive relief sought by them against defendant.

Settle judgment in accordance with the foregoing views, with no provision for costs to either side.